**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CARESSA LOCKHART, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 12 C 0486 |
| v. | ) |
| | ) |
| ST. BERNARD HOSPITAL, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Pro se Plaintiff Caressa Lockhart brought the present Complaint alleging intentional discrimination, hostile work environment, and retaliation claims based on her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and 42 U.S.C. § 1981 against her former employer Defendant St. Bernard Hospital (the "Hospital").[1] Before the Court is the Hospital's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the Court grants the Hospital's motion and dismisses this lawsuit in its entirety.

**BACKGROUND**

**I.      Northern District of Illinois Local Rule 56.1**

Because Lockhart is a pro se litigant, the Hospital served her with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois Local Rule 56.2. The notice explains the consequences of failing to properly respond to a

---

[1] Lockhart admits that she did not file a claim for sex discrimination or sexual harassment in her EEOC charge and that she is not pursuing any claims for sex discrimination or sexual harassment in this lawsuit. (R. 50, Defs.' Rule 56.1 Stmt. ¶ 76.)

motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure 56 and Local Rule 56.1.

Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). "The Rule is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Also, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that requires the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response, but instead must rely on the nonmovant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts when making factual determinations. *See id.* at 643; *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005).

The purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). The Court may disregard statements and responses that do not properly cite to the record. *See Cady,* 467 F.3d at 1060; *Cichon,* 401 F.3d at 809-10. Furthermore, the citations in the fact section of the parties' legal briefs should be to the Local Rule 56.1 statements by paragraph, and not to the actual evidence in the record. *See Malec v. Sanford,* 191 F.R.D. 581, 586 (N.D. Ill. 2000).

Although courts must construe pro se pleadings liberally, *Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012), a plaintiff's pro se status does not absolve her from complying with the federal and local procedural rules. *See Pearle Vision, Inc. v. Romm,* 541 F.3d 751, 758 (7th Cir. 2008); *Greer v. Board of Ed. of City of Chicago,* 267 F.3d 723, 727 (7th Cir. 2001). As the Supreme Court instructs, "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993).

Many of the statements in Lockhart's Local Rule 56.1(b)(3)(C) Statement of Additional Facts and Local Rule 56.1(b)(3)(B) Response do not cite to any portions of the record. These statements and responses fail to comply with the Local Rules, and thus the Court disregards them. *See Cady,* 467 F.3d at 1060; *see also Delapaz,* 634 F.3d at 899 ("the obligation set forth in Local Rule 56.1 'is not a mere formality.'") (citation omitted). Moreover, the Court disregards Lockhart's legal arguments made in her Local Rule 56.1 Statements. *See Cady,* 467

F.3d at 1060. With these standards in mind, the Court turns to the relevant facts of this case.

## II. Relevant Facts

Lockhart is a former employee of the Hospital, which is a not-for-profit medical services provider located in Chicago, Illinois. (R. 50, Def.'s Rule 56.1 Stmt. Facts ¶¶ 1, 2.) Lockhart, who is African American, worked as a monitor technician in the Intermediate Care Unit ("IMC") at the Hospital from May 17, 2010 until May 5, 2011. (*Id.* ¶ 3.) Except for the first four weeks of her employment, Lockhart worked the third shift in the IMC, which was from 11:00 p.m. to 7:00 a.m. (*Id.*) The IMC is a transitional unit for patients transferring out of the Intensive Care Unit ("ICU"). (*Id.* ¶ 4.) The IMC also houses patients with cardiac and other complex medical problems. (*Id.* ¶¶ 4, 5.)

The third shift of the IMC is usually staffed with four to six registered nurses, two to three certified nursing assistants, and one monitor technician. (*Id.* ¶ 5.) Monitor technicians, like Lockhart, report to the managing nurse, who during the relevant time period was Brenda Eduarte. (*Id.* ¶ 8.) Because Eduarte works the first shift, monitor technicians who work the other shifts took their immediate work concerns to the charge nurse in the IMC unit or to the house coordinator. (*Id.*) Monitor technicians are responsible for hooking IMC patients to telemetry monitors and providing constant monitoring of the patients' heart rate and rhythm at the monitor station located in the unit. (*Id.* ¶ 9.) At set periods, the monitor technician runs a paper strip of the heart rate and rhythm and provides the strip to the nurse assigned to the particular patient. (*Id.*) If a patient has a change in heart rate and/or rhythm that requires immediate attention, it is the responsibility of the monitor technician to inform the appropriate nurse. (*Id.*) Furthermore, it is the responsibility of the monitor technician to unhook patients

when necessary and to re-hook patients whose leads have become disconnected. (*Id.* ¶ 10.)

Nurses on the IMC unit are responsible for patient care, which includes charting patient treatment and records, administering medication, taking blood, educating patients about care, and coordinating the delivery of services from other units. (*Id.* ¶ 11.) While nurses often connect patients to telemetry monitors in the course of their work — such as when they are in a patient's room and observe that a lead is off — this is not the nurses' primary responsibility. (*Id.*) Accordingly, it is appropriate for nurses to ask monitor technicians to re-attach patients to the telemetry leads. (*Id.* ¶ 12.) IMC nurses worked twelve-hour shifts that overlapped with the three shifts of monitor technicians. (*Id.* ¶ 14.) During the relevant time period, nurse Resty Pagala worked from 7:00 p.m. to 7:00 a.m. and overlapped with Lockhart two to three days a week. (*Id.*)

During Lockhart's employment with the Hospital, the nurses who worked during the third shift raised some concerns with House Coordinator Arlene Fryhart and Managing Nurse Eduarte about Lockhart's inability to properly ensure that IMC patients were hooked to the telemetry monitors, although Lockhart maintains that the nurses' statements were false. (*Id.* ¶ 16; R. 64, Pl.'s Rule 56.1 Stmt. Facts ¶¶ 27, 28.) Eduarte met with Lockhart on multiple occasions to discuss the nurses' concerns that Lockhart was not keeping patients properly connected to the telemetry monitors. (Def.'s Stmt. Facts ¶ 17.) During these discussions, Lockhart complained that she felt the nurses were not properly doing their jobs, that she saw things that the nurses did that were inappropriate, and that the nurses did not cover for her while she was on break. (*Id.* ¶¶ 17, 19.) Also, Lockhart complained to a house coordinator about a confrontation with another

employee and whether he unhooked a patient from a monitor. (*Id*. ¶ 21.) It is undisputed that at no time during her discussions with Eduarte and Fryhart did Lockhart say that she felt any of the nurses or anyone else was treating her differently or harassing her on the basis of her race. (*Id*. ¶¶ 18, 23.)

Meanwhile, in the fall of 2010, Lockhart complained to Eduarte specifically about nurse Pagala. (*Id*. ¶ 24.) Lockhart documented the incident in a written statement in which she stated that Pagala's conduct was disrespectful and unprofessional and that he told her that no one liked her and that she should go home. (*Id*. ¶ 34; Pl.'s Stmt. Facts ¶ 29.) It is undisputed that Lockhart reported these comments to Eduarte and a house coordinator, but that she did not report that she felt Pagala's comments were due to her race. (Def.'s Stmt. Facts ¶ 34.)[2]

On January 25, 2011, an incident between Pagala and Lockhart occurred when Lockhart returned from her break. (*Id*. ¶ 38.) In particular, Pagala was at the monitor technicians' work station printing monitor strips and Lockhart felt Pagala was angry at her. (*Id*.) According to Lockhart, Pagala was blocking access to the work station and she asked him to move so she could sit down. (*Id*. ¶ 39.) Both Pagala and Lockhart then yelled at each other and, according to Lockhart, Pagala pushed her arm when he left the work station. (*Id*. ¶ 40.) Thereafter, Lockhart reported this incident to a house coordinator and the Hospital's security department specifically stating that Pagala had physically hit her. (*Id*. ¶ 43.)

Later that day, Lockhart's complaint about Pagala and the incident between them was reported to the Director of Human Resources, Donna Dertz. (*Id*. ¶ 44.) Dertz immediately

---

[2] In the Hospital's Local Rule 56.1(a)(3) Statement of Facts, its statements after ¶ 35 are numbered ¶¶ 18-61. For the sake of clarity, the Court refers to these paragraphs as ¶¶ 36-79.

called a meeting to investigate Lockhart's complaint. (*Id*.) Lockhart, Pagala, Dertz, Eduarte, Evelyn Jones, the Chief Nursing Officer, and Faye Terry, Lockhart's union representative, were present at the meeting. (*Id*.) During the meeting, Lockhart described what had occurred with Pagala on their previous shift, including showing the group how Pagala had hit her. (*Id*. ¶ 45.) Pagala was asked to describe what had happened from his perspective and he stated that he had not hit Lockhart. (*Id*. ¶ 46.) An IMC nurse who witnessed the incident explained via speaker phone that she had heard Pagala and Lockhart yell at each other and that it appeared that Lockhart had blocked Pagala in at the work station. (*Id*. ¶ 48.) The nurse further stated that any contact between the two was incidental and that she did not believe Pagala had intentionally hit Lockhart, although Lockhart maintains that this the nurse encouraged her to file the complaint against Pagala in the first instance. (*Id*.) In any event, Dertz concluded that both employees had conducted themselves in an unprofessional manner, and thus recommended that both receive written warnings. (*Id*. ¶ 49.) Dertz prepared those warnings, and together with Jones and Eduarte, presented Pagala his written warning in a meeting and also presented Lockhart a written warning in a separate meeting. (*Id*.; Pl.'s Stmt. Facts ¶ 20.) Lockhart refused to sign the written warning because she felt that Dertz had attacked her, was unprofessional, and did not take Lockhart's side. (Def.'s Stmt. Facts ¶ 50.) Moreover, Lockhart felt that Pagala should have been removed from IMC, fired, or suspended. (*Id*. ¶ 51.) Lockhart did not grieve her January 25, 2011 written warning. (*Id*. ¶ 52.)

On April 15, 2011, Lockhart received a written warning about not hooking up patients in the IMC. (*Id*. ¶ 55.) Jones issued the written warning to Lockhart and required her to sign a job description clarifying her role keeping patients attached to their monitors. (*Id*. ¶ 56.) Lockhart

refused to sign the written warning. (*Id*.) On or about April 15, 2011, Lockhart met with Dertz, Eduarte, Jones, and her union representative to discuss this April incident. (*Id*. ¶ 57.) Nevertheless, Lockhart did not grieve the April 15, 2011 written warning. (*Id*. ¶ 58.) Dertz conducted a general meeting in late April or early May 2011 concerning patients being attached to telemetry monitors. (*Id*. ¶ 60.) In early May 2011, IMC implemented the use of a log book for employees to record when they connected patients to the telemetry monitor. (*Id*.)

On May 3, 2011, Lockhart prepared a letter of resignation to the Hospital and gave it to Eduarte that day. (*Id*. ¶ 66.) In the letter, Lockhart informed Eduarte that she would be resigning on May 5, 2011, but she did not give any explanation or have a discussion with Eduarte at that time. (*Id*.) Indeed, Lockhart never told anyone at the Hospital why she resigned from her position with the Hospital. (*Id*. ¶ 68.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary

judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "A plaintiff must begin to meet this burden by submitting admissible, supporting evidence in response to a proper motion for summary judgment." *Harney v. City of Chicago,* 702 F.3d 916, 925 (7th Cir. 2012); *see also Fleishman v. Continental Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012) ("To survive summary judgment, the nonmovant must produce sufficient admissible evidence, taken in the light most favorable to it, to return a jury verdict in its favor.").

## ANALYSIS

**I.    Hostile Work Environment Claim**

Construing her pro se Complaint liberally, *see Gomez*, 680 F.3d at 864, Lockhart first brings a hostile work environment claim based on her race. Title VII prohibits an employer from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).[3] To succeed on a hostile work environment claim, Lockhart must establish that: (1) her work environment was both objectively and subjectively offensive; (2) the harassment was based on her race; (3) the conduct was either severe or pervasive; and (4) a basis for employer liability. *See May v. Chrysler Group,* LLC, 692 F.3d 734, 743 (7th Cir. 2012); *Milligan v. Board of Trs. of So. Ill. Univ.,* 686 F.3d 378, 383 (7th Cir. 2012). "In determining whether the evidence in support of a hostile work environment claim meets this standard, [courts] consider the totality of the circumstances." *Porter v. City of Chicago,* 700 F.3d 944, 955-56 (7th Cir. 2012).

---

[3] Courts analyze Section 1981 hostile work environment claims in the same manner as hostile work environment claims under Title VII. *See Yancick v. Hanna Steel Corp.,* 653 F.3d 532, 544 (7th Cir. 2011).

In support of her hostile work environment claim, Lockhart maintains that Pagala and other nurses made untrue statements about her not doing her job of connecting patients to the telemetry monitors. She also asserts a nurse named Ronald Suarez bumped into her and told her to hook up patient leads. Suarez also made a rude comment that the IMC needed a new monitor technician. Thereafter, Lockhart informed the house coordinator of these incidents, but the house coordinator did not report them. In further support of her hostile work environment claim, Lockhart asserts that Pagala told her that no one at work liked her and that she should go home. Despite Lockhart reporting this to Eduarte, Pagala continued to make unprofessional comments about her. Lockhart also points to Pagala's hitting her on January 25, 2011 and that Dertz and other Hospital management did not properly investigate this incident.

Assuming all of these facts are true for purposes of this summary judgment motion and considering the totality of the circumstances, Lockhart has failed to present sufficient, admissible evidence creating a genuine dispute that the nurses' comments and Hospital management's conduct were based on her race. Although comments and conduct need not be explicitly racial to create a hostile work environment, the conduct must have a racial character or purpose to support Lockhart's claim. *See Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011); *see also Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 863-64 (7th Cir. 2005) ("the alleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race.") (citation omitted). Here, Lockhart has not presented any evidence that the nurses' or management's comments or conduct were motivated by or had anything to do with her race. *See Vance,* 646 F.3d at 470. Also, "[t]here is no inherently racial component to an employer providing an employee with a critical

10

(even an unfairly critical) performance review." *Beamon,* 411 F.3d at 864. Meanwhile, Lockhart admits that at no time during her discussions with Eduarte and Fryhart did she believe that the nurses or anyone else was treating her differently or harassing her on the basis of her race. There is little doubt that Lockhart subjectively believed that her workplace was hostile, but construing the evidence in her favor, the basis of the hostility was not her race. Indeed, although the nurses' conduct towards Lockhart was unprofessional, unkind, and at times aggressive, *see Vance,* 646 F.3d at 470, Lockhart's harassment allegations do not amount to a hostile work environment because she does set forth any evidence that she was the target of race-related behavior. *See id.*; *Luckie v. Ameritech Corp.,* 389 F.3d 708, 713 (7th Cir. 2004). The Court therefore grants the Hospital's summary judgment motion in regard to Lockhart's hostile work environment claim.

## II. Race Discrimination Claim

Next, Lockhart alleges that the Hospital intentionally discriminated against her based on her race in violation of Title VII and 42 U.S.C. § 1981. Because discrimination claims under Title VII and § 1981 are essentially identical, courts do not analyze them separately. *See Brown v. Advocate So. Suburban Hosp.,* 700 F.3d 1101, 1104 n.1 (7th Cir. 2012); *Dass v. Chicago Bd. of Educ.,* 675 F.3d 1060, 1068 (7th Cir. 2012). To avoid summary judgment on her race discrimination claim, Lockhart may use either the direct or indirect method of proof pursuant to the familiar burden-shifting *McDonnell Douglas* framework. *See Brown,* 700 F.3d at 1104. Because Lockhart has not presented evidence under the direct method of proof, the Court turns to the indirect method of proof under *McDonnell Douglas* and its progeny.

Under the burden-shifting analysis, Lockhart "must first establish a prima facie case of discrimination by demonstrating that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). If Lockhart establishes a prima facie case of race discrimination, the burden then shifts to the Hospital to articulate a nondiscriminatory reason for the adverse employment action. *See id.*; *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012). If the Hospital does so, the burden shifts back to Lockhart to present evidence that demonstrates the Hospital's explanation is pretext for race discrimination. *See Keeton,* 667 F.3d at 884-85; *Coleman,* 667 F.3d at 845.

The Court turns to whether similarly situated employees outside of Lockhart's protected class, namely, non-African Americans, received more favorable treatment because this inquiry is dispositive. To establish this element, Lockhart must provide some evidence that the Hospital treated her differently than another employee who is directly comparable to her in all material respects except that the individual is not African American. *See Brown,* 700 F.3d at 1104. Although the similarly situated test is flexible, a plaintiff must present some evidence that the similarly situated comparator had the same supervisor, was subject to the same standards, and engaged in similar conduct. *See Coleman,* 667 F.3d 847. "The purpose of the 'similarly situated' comparator element is to ensure that all other variables are discounted so that an inference of unlawful intent would be reasonable." *Silverman v. Board of Educ. of City of Chicago,* 637 F.3d 729, 742 (7th Cir. 2011).

In support of her argument that the Hospital treated non-African American employees more favorably, Lockhart points to Pagala's conduct during the relevant time period arguing that he only received one written warning while she was working at the Hospital, whereas she received many. In order to establish that Pagala fits this category, Lockhart must present some admissible evidence that Pagala was subject to the same standard and job duties, namely, that it was his primary responsibility as a nurse to connect patients to the telemetry monitors and that the Hospital did not discipline him, like it disciplined Lockhart, when he failed to do so.

It is undisputed that Pagala and Lockhart were not subject to the same standards or job duties because Pagala is a nurse and Lockhart was a monitor technician. As the record reflects, monitor technicians, such as Lockhart, are responsible for connecting IMC patients to telemetry monitors and providing constant monitoring of patients' heart rates and rhythm. Monitor technicians also have the responsibility of running heart rate and rhythm strips and providing these strips to the nurse assigned to the particular patient. If a patient has a change in heart rate and/or rhythm that requires immediate attention, the monitor technician has the responsibility to inform the appropriate nurse. Furthermore, it is the responsibility of the monitor technician to unhook patients when necessary and to re-hook patients whose leads have become disconnected. Meanwhile, as Lockhart admits, the Hospital disciplined her a number of times for her poor performance regarding her job duties as a monitor technician. (R. 65, Resp. Brief, at 4-5; Pl.'s Stmt. Facts ¶¶ 10-12, 14-15.)

On the other hand, nurses on the IMC unit, like Pagala, are responsible for patient care, including charting patient treatment and records, administering medication, taking blood, educating patients about care, and coordinating the delivery of services from other units.

13

Although nurses often connect patients to telemetry monitors in the course of their work, this is not the nurses' primary responsibility. Viewing these facts in a light most favorable to Lockhart, it was not Pagala's responsibility to connect patients to the telemetry monitors. Instead, it was part of the monitor technician's job responsibility. In fact, Lockhart admits that it was appropriate for nurses to ask her to re-attach patients to the telemetry leads. As such, Lockhart has failed to present sufficient, admissible evidence creating a genuine dispute that Pagala was similarly situated to her in all material respects.

Lockhart's other arguments are equally unavailing. First, Lockhart's argument that other workers in her protected class did not receive the same discipline she did for failing to attach patients to the telemetry monitors confuses the prima facie standard in which Lockhart must present evidence that workers outside of her protected class — non-African Americans — were not similarly disciplined for the same conduct. *See Naficy v. Illinois Dep't of Human Servs.,* 697 F.3d 504, 512 (7th Cir. 2012). Also, Lockhart's argument that the Hospital failed to show that it disciplined other workers improperly shifts the burden of production to the Hospital. *See id.* Accordingly, construing the facts and all reasonable inferences in Lockhart's favor, she has failed to establish a prima facie case of intentional race discrimination. *See Brown,* 700 F.3d at 1104 (viewing facts in nonmovant's favor "does not extend to drawing inferences that are supported by only speculation or conjecture") (citation omitted). The Court therefore grants the Hospital's summary judgment motion as to Lockhart's race discrimination claim.

### III.    Other Claims

On a final note, Lockhart does not discuss her retaliation claim in her legal memorandum in opposition to the Hospital's summary judgment motion. Hence, she has abandoned any such

claim. *See Steen v. Myers*, 486 F.3d 1017, 1020 (7th Cir. 2007) (absence of discussion amounts to abandonment of claim). Indeed, Lockhart did not make any allegations of retaliation in her EEOC Charge and there is no evidence in the record supporting any such claim. *See Swearnigen-El v. Cook County Sheriff's Dept.,* 602 F.3d 852, 864 (7th Cir. 2010).

Similarly, Lockhart's bared-boned allegations of constructive discharge fail because she has not presented evidence that is "even more egregious than that needed for a hostile work environment such that [s]he was forced to resign because [her] working conditions from the standpoint of the reasonable employee had become unbearable." *Overly v. KeyBank Natl. Ass'n* 662 F.3d 856, 864-65 (7th Cir. 2011); *see also Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 650 (7th Cir. 2011) ("establishing constructive discharge is more difficult than establishing a hostile work environment"). As such, Lockhart's retaliation and constructive discharge claims fail.

## CONCLUSION

For the these reasons, the Court grants Defendant's motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a) and dismisses this lawsuit in its entirety.

**Date:** April 1, 2013

**ENTERED**

*[signature]*

**AMY J. ST. EVE**
**United States District Court Judge**